Filed 4/8/15  P. v. Buckner CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B247411 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA057396) |
| v. | |
| TANYA Y. BUCKNER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Carol Koppel, Judge.  Affirmed.

Susan Wolk, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Kathy S. Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Tanya Buckner of driving under the influence and causing injury in violation of Vehicle Code section 23153, subdivision (a)[1] (count 1) and leaving the scene of an accident in violation of section 20001, subdivision (a) (count 2). In count 1, the jury found that defendant personally inflicted great bodily injury within the meaning of Penal Code section 12022.7, subdivision (a).

The trial court sentenced defendant in count 1 to the midterm of two years and three years for the great bodily injury allegation. In count 2, the court imposed a concurrent sentence of two years (the midterm). Defendant's total sentence is five years in state prison.

Defendant appeals on the grounds that: (1) the trial court's failure to recuse itself was an abuse of discretion; (2) allowing a former juror to testify as a prosecution witness was an abuse of discretion that denied defendant a fair trial, an impartial jury, and reliable verdicts; (3) defendant was denied due process, a fair trial, and reliable verdicts when the former juror was untruthful in his voir dire responses; (4) the trial court abused its discretion by admitting videos of a deceleration test and a sobriety test; (5) the prosecutor committed prejudicial misconduct; (6) the evidence is insufficient to sustain the conviction in count 1; (7) the trial court erred in failing to instruct on the lesser included offense of misdemeanor driving under the influence; (8) the trial court violated Penal Code section 654 by imposing multiple punishment; (9) the five-year prison sentence was an abuse of discretion; (10) the sentence constituted cruel and unusual punishment; and (11) the effect of the errors, both singly and cumulatively, resulted in a fundamentally unfair trial, requiring reversal of the judgment, particularly in count 1.

## FACTS

**Prosecution Evidence**

On September 12, 2012, at approximately 7:00 a.m., Deputy Jason Jackman, a motorcycle traffic enforcement deputy with the Los Angeles County Sheriff's

---

[1]     All further references to statutes are to the Vehicle Code unless stated otherwise.

Department (LASD), was riding with his partner, Deputy Chris Matthews. They were proceeding westbound on Palmdale Boulevard in light traffic. As they approached 2nd Street, a small red vehicle traveling southbound from a stop sign pulled out in front of them. Deputy Jackman believed he and Deputy Matthews were traveling at approximately 40 miles per hour. At first, Deputy Jackman tried to assess what the driver of the red vehicle was going to do. When he realized it was going to come out in front of them, he slammed on his brakes and swerved to the left. His motorcycle came to a stop in the opposing traffic lane's turn lane.

Deputy Matthews continued perhaps five to 10 feet ahead of Deputy Jackman before hitting his brakes. Deputy Jackman saw Deputy Matthews "hit the vehicle." Deputy Matthews's motorcycle grazed the front of the red vehicle. He went down on his side and then slid with his motorcycle. Deputy Jackman jumped off his motorcycle and went to Deputy Matthews's aid. Deputy Matthews was in pain, and Deputy Jackman radioed for medical assistance.

Deputy Jackman looked around for the red vehicle. He saw a red vehicle going eastbound through a parking lot. He radioed that there had been a hit and run and gave a description of the vehicle he saw driving away. Deputy Jackman found the license plate of the vehicle on the street, and he broadcast the number.

Deputy Jackman described the training required for certification as a motorcycle deputy with the LASD. He described the 40-mile-an-hour deceleration test that trainees undergo. The test requires them to stop within a certain distance after braking at 40 miles an hour. Deputies must take the test four times a year and do three successful attempts in succession to qualify. If a deputy fails at training, he can be removed from motorcycle duty. The jury viewed a video showing a "40-mile-an-hour decel" training session that Deputy Jackman said was "pretty much identical" to the one sheriff's deputies undergo, although the video was from another agency.

Deputy Matthews testified that upon impact with the ground he was dazed and had extreme pain in his right shoulder and back. He stood up and saw that the car that had struck him was gone. He was in the hospital for less than a day. He was in pain for

3

several days and had difficulty rising from a lying position and breathing or coughing. He suffered a fracture of the right clavicle and two fractured ribs. He was on pain medication for four or five weeks and off work for approximately two and a half months. When asked if he could clearly see the red car stopped at the stop sign, he said he could. He did not recall telling hospital personnel that he "ran into a car that pulled out in front of him." He recalled that it "it inched out and then at the last minute it started to accelerate, and I thought it would be a hazard at that point in time." He hit his brakes to avoid a collision, and the next thing he knew he was on the ground. Deputy Matthews had never failed the 40-mile-an-hour deceleration test.

Santana Maria Bonilla testified that she was turning right onto Palmdale Boulevard from 2nd Street when she saw a red car cross the path where two officers were riding. She saw the car cross and hit one of them. She testified that the red car never came to a complete stop at the stop sign. The red car had been on her left side. After hitting the police officer, the car went straight and then made a left turn. The red car did not stop in the intersection after the collision occurred.

Deputy Dennis Miller heard the broadcast about the traffic collision, the description of the car leaving the scene, and the license plate. He looked up the address associated with that plate number and headed to that location, which was approximately one minute away from him. He and a deputy in a second car began driving through that area looking for the vehicle. Deputy Miller saw a red Ford Escort traveling at a high rate of speed and attempted to catch up to it. The license plate was a match. He activated his lights and siren for a felony traffic stop. The red Escort proceeded for approximately 100 feet and then turned into a driveway where the driver, defendant, got out. When Deputy Miller approached her at gunpoint, defendant said, "I'm sorry." Defendant was detained.

J.S.,who had initially been selected for the jury, testified that he was driving westbound toward McDonald's restaurant on the morning of the incident when he saw a motorcycle on the ground and another one standing upright. He passed them and pulled into McDonald's. As he walked toward the restaurant, he heard sirens and saw that an

4

ambulance and police cars were arriving. He watched the activity. He did not see any cars in the area.

Deputy Steven Van Ornum questioned defendant after she was detained. She admitted she had driven that morning and said she was involved in an accident with a sheriff's deputy. She said she was stopped at a stop sign, waiting to enter Palmdale Boulevard to make a left turn. She waited for a vehicle traveling westbound to pass and then she proceed from 2nd Street into the intersection, at which time she saw two motor units traveling westbound sharing the number one lane. She had no time to react and had to brake to avoid them. After the officer had begun to brake, she and the officer were unable to avoid a collision. Because she did not want to be a hazard in the roadway, she drove across Palmdale Boulevard into the parking lot of an In-N-Out restaurant to get her vehicle off the road. When she got there, she became nervous and afraid the deputies would take her car, so she decided to leave the scene. She said she planned to park her car at home and walk to the nearby police station.

When asked to describe defendant's demeanor, Deputy Van Ornum testified that she spoke very slowly and was very quiet. She seemed very calm and almost lethargic, as if she was tired. Deputy Van Ornum believed this was abnormal for a person recently involved in an accident. She did not seem "like she was all there," and Deputy Van Ornum decided to conduct a driving-under-the-influence investigation. Defendant's pulse rate was 52 beats per minute, and after the tests she was still extremely low at 54 beats per minute. Deputy Van Ornum conducted the Romberg test, the horizontal gaze nystagmus test, the vertical nystagmus test,, the walk-and-turn test, the one-leg stand, and the finger-to-nose test. During Deputy Van Ornum's testimony, the jury was shown a video demonstrating how some of the tests are conducted.

Based on the results of the field sobriety tests, which Deputy Van Ornum described in detail for the jury, he determined that defendant was unable to drive a vehicle. He placed her under arrest for driving under the influence and for the hit and run. He also contacted the sheriff's station and requested a drug recognition expert

5

(DRE). Deputy Van Ornum booked defendant's urine sample into evidence, and from there it was sent to a laboratory.

When asked for his opinion as to whether defendant was driving impaired on the day of the collision, Deputy Van Ornum testified that based on the field sobriety tests, his 13 years of experience, and his training, he was of the opinion that she was under the influence of a controlled substance. He acknowledged he did not smell any marijuana on defendant's breath. There was no drug paraphernalia found in the car.

Deputy Andrew Cronin was certified in the DRE program and had frequently had contact with persons under the influence of narcotics in his 17-year career. DRE's follow a 12-step procedure, or checklist, that has been scientifically proven to determine whether someone is under the influence. Deputy Cronin testified that his opinions retain validity and can be used in a court of law even without confirming results from a toxicology report. The standardized checklist is comprised of objective criteria.

People's exhibit 16-A was a "drug evaluation and classification program drug influence evaluation checklist." In examining defendant, Deputy Cronin rigorously followed the 12 steps and filled out a drug recognition evaluation form. He explained that, if more than one drug has been used by an individual, the drugs may affect each other's manifestation and may cancel each other out. Deputy Cronin testified regarding each of the 12 steps he went through with defendant, some of which were repetitive of the field sobriety tests. In the first step, the officer asks questions of the individual. Defendant told Deputy Cronin she had slept only five or six hours the night before. She said she had been taking Midol for a couple of days before the incident and had taken a sleep aid. She acknowledged that she had been under the influence "before in her history." Deputy Cronin, unlike Deputy Van Ornum, found that defendant's pulse rate was normal. In the eye examination he conducted, Deputy Cronin noted that defendant's eyelids were droopy. Unlike Deputy Van Ornum, Deputy Cronin detected no nystagmus in defendant's eyes, although she did display a lack of convergence, which was inconsistent with analgesics. The other portions of the eye exam were consistent with analgesics. Deputy Cronin noted that defendant scratched her forehead and her face

6

during the evaluation without stopping. This was consistent with narcotic analgesic ingestion.

As a result of the totality of the results of the 12-step evaluation and his observations of defendant, Deputy Cronin's opinion was that defendant was under the influence of cannabis and a narcotic analgesic. She was impaired in a way that would be unsafe for her to drive.

Steven Kline, a senior criminalist in the toxicology section of the LASD crime laboratory, explained the different roles of a DRE and a toxicologist. He explained that the DRE has advanced training in being able to recognize impairment and to link signs of impairment to a particular class of drugs. Kline was of the opinion that the best person to evaluate impairment is the one who actually interacted with the individual and made the multitude of observations needed to discern whether the person is impaired. The toxicologist has more expertise in the scientific studies of a particular drug. Kline performed a marijuana confirmation assay on defendant's urine sample. The sample contained 1,280 nanograms per milliliter of marijuana metabolite.

Kline explained that driving is a fairly complex divided-attention task. Any of the drugs that the lab tests for can impair divided-attention tasks because they affect cognitive abilities that are important for the safe operation of a car. The field sobriety tests were designed as rough mimics of some of the skills needed to operate a vehicle. There are no perfect tests for ascertaining if a person is positively impaired by marijuana, but there are useful tools that, when used together, can help an evaluator form an opinion. Scientists rely very heavily on the observations of the arresting officers. In defendant's case, looking at all of the information—including the toxicology result, the arrest report, the DRE evaluation form, and the field sobriety tests—Kline's opinion as a toxicologist was that defendant exhibited obvious and numerous signs of impairment and was impaired. In addition, the collision was consistent with someone being impaired.

Kline defined "impairment" as a condition "due to a drug or substance that renders the person unable to drive a car as safely as a sober person." With respect to Deputy Cronin's opinion that defendant was under the influence of a narcotic analgesic, Kline

stated there were several clues on the DRE exam that would lead one to conclude there was narcotic analgesic influence. The person who does the hands-on examination is in the best position to decide. A narcotic analgesic is a broad class of painkillers and includes morphine, codeine, hydrocodone, oxycodone, methadone, and puradine.

Kline made a recommendation based on the various reported physiological signs that there might have been a drug present that was not detected in the standard seven-class drug screen. This was fairly common, and agencies can resubmit a urine sample for the lab to perform a more comprehensive test for other classes of drugs. Kline was informed that the sample had been exhausted, however. He knew that what remained of the sample after his lab's tests was provided to the defense because it was not a large amount. Kline had wished to test for depressants, sleeping pills, and narcotic analgesics which would not be detected in the initial screening. When they did the initial test on October 18, 2012, he did not have the police reports, and it was "far too early for [him] to have contacted or have been contacted by a prosecutor . . . to talk about a case that may be going to court."

Kline explained that a urine test does not determine impairment. The result of a urine test may provide an explanation for signs of impairment, but it does not indicate that the person is currently impaired because urine is a historical record of what may have occurred in the last day or so. Kline confirmed that the presence of metabolites shows only that someone has smoked some marijuana at some time without pinpointing that they are under the influence at the time of driving.

**Defense Evidence**

Oscar Aleman worked at Clark and Howard Tow, where defendant's car was impounded on September 12, 2012. It was understood at the tow company that after 48 hours, if no action is taken, the company can release a vehicle from evidence. Defendant's car was sold on October 29, 2012. There was no "hold" on the car.

John Treuting testified as an expert in toxicology. He believed that defendant gave no answers to the DRE that suggested marijuana use. As a pharmacist, Treuting had

8

difficulty understanding where in the narrative or results a narcotic analgesic was indicated. Midol was not a narcotic analgesic.

Treuting did not agree with Deputy Cronin's interpretation of the ocular tests he performed. Treuting had difficulty understanding the lack of convergence as being consistent with marijuana. Treuting noted that defendant had said she was a victim of domestic violence. That could be related to "some sort of jostling from a cerebral point of view." Treuting believed the indication that the test results were consistent with marijuana "may be just another way of saying they would be consistent with anything that could necessarily have an effect on your body," whether drugs or not. The finding that a temperature of 98.1 degrees was consistent with marijuana was not a fair assessment. The same was true for the finding that defendant's pupil size, which was within the normal range, was consistent with marijuana. The urine results only demonstrated carboxy THC, which could have been from use of marijuana days before.

As for narcotic analgesics, most that are in use today would "cross-react" and indicate something might be there. A confirmatory test would follow. In this case, they could not find anything in the screening test and therefore did not do a confirmatory test. Treuting stated that, from a scientific perspective, he was of the opinion that the totality of the information did not indicate that the individual was under the influence of cannabis at the time of the incident to the degree that she could not safely drive. He later stated that he could not say with absolute analytical or scientific certainty based on the totality of the information that the individual was impaired by cannabis and unable to safely drive a motor vehicle.

Treuting testified that if an individual does poorly on a field sobriety test it does not mean that the individual is necessarily impaired for purposes of driving a motor vehicle "in totality." It just means "he or she did not perform that test as it relates to understanding what the test is asked to do."

Treuting was not aware that defendant had hit and run. To Treuting, this fact meant she did not use good judgment. It might not mean she was impaired from a drug— it depended upon the drug. Treuting's opinion was not affected by factors such as

defendant's puncture mark, use of sleeping pills, historic use of drugs, soft and slow speech, blood pressure, temperature, heart rate, calm demeanor, or denial of fatigue.

Isaac Ikram is an accident reconstructionist and biomechanical engineer. He stated that the contact that occurred between the motorcycle and the front of defendant's Ford Escort was a glancing contact. He determined that the motorcycle's speed at impact was between 13.1 and 17.2 miles per hour. If Deputy Matthews had applied his brakes approximately .3 seconds sooner, he would have stopped five feet prior to the area of impact and there would not have been a collision. He believed defendant had stopped at the stop sign, judging by the fact that the officers had time to recognize there was a hazard. He believed Deputy Matthews applied his brakes between .6 to 1.1 seconds after Deputy Jackman and that is why he traveled farther. Ikram's opinion was based on the laws of physics and not the requirements of the Vehicle Code.

## DISCUSSION

### I. Recusal

#### A. *Defendant's Argument*

Defendant contends that Judge Kathleen Blanchard's denial of defendant's request that the court recuse itself was an abuse of discretion. In the alternative, the ruling denied defendant due process and a fair proceeding. The fact that the case involved an on-duty deputy sheriff should have been enough for the judge to automatically recuse herself, since she was married to a deputy within the same organization, she was endorsed for her judicial seat by Los Angeles County Sheriff Leroy D. Baca, and, according to a newspaper article, "a number of police and prosecuting attorneys associations" also endorsed her. Defendant also asserts that "individual deputies, as well as associations related directly and indirectly to LASD may have contributed financially to her judicial campaign." Defendant additionally alleges that the court violated the 2013 amended California Code of Judicial Ethics in that the court's refusal to disqualify itself resulted in the appearance of impropriety as defined by the judicial canons.

Defendant asserts she suffered prejudice by being forced to exercise her one and only affidavit under Code of Civil Procedure section 170.6 against Judge Blanchard. It

was thus not available for use against the trial judge, Judge Carol Koppel, who repeatedly committed prejudicial errors in procedure, evidentiary rulings, and sentencing.

## B. *Relevant Authority*

Code of Civil Procedure section 170.1, subdivision (a)(6) (A) provides that a judge shall be disqualified if "For any reason: (i) The judge believes his or her recusal would further the interests of justice. (ii) The judge believes there is a substantial doubt as to his or her capacity to be impartial. (iii) A person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial."

A judge's impartiality is evaluated by an objective, rather than subjective, standard. (*People v. Cowan* (2010) 50 Cal.4th 401, 456; see also *Flier v. Superior Court* (1994) 23 Cal.App.4th 165, 170.) "Potential bias and prejudice must clearly be established [citation] and statutes authorizing disqualification of a judge on grounds of bias must be applied with restraint. [Citation.]" (*Roitz v. Coldwell Banker Residential Brokerage Co.* (1998) 62 Cal.App.4th 716, 724.)

A criminal defendant also has a due process right to an impartial trial judge under the state and federal Constitutions. (*People v. Cowan*, *supra*, 50 Cal.4th at p. 455, citing *Caperton v. A.T. Massey Coal Co.* (2009) 556 U.S. 868, 876; *People v. Guerra* (2006) 37 Cal.4th 1067, 1111, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) The constitutional right to due process "requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of the case." (*Guerra*, at p. 1111.) "[W]hile a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient. Instead, based on an objective assessment of the circumstances in the particular case, there must exist '"the probability of actual bias on the part of the judge or decision-maker [that] is too high to be constitutionally tolerable."'" [Citation.]" (*People v. Freeman* (2010) 47 Cal.4th 993, 996.) The due process clause should not be routinely called upon as a ground for judicial disqualification, and "it is the exceptional case presenting extreme facts where a due process violation will be found. [Citation.]" (*Id*. at p. 1005.)

11

## C. Proceedings Below

The clerk's transcript contains a minute order of the proceedings on November 19, 2012, stating, "The defendant having refused to sign the written disclosure, the court orally discloses that her spouse is employed by the Los Angeles County Sheriff's Department. The defendant's request that the court recuse itself is denied." The minute order subsequently states that the defense filed an affidavit pursuant to Code of Civil Procedure section 170.6 and that the matter was ordered transferred to Department A16 for all purposes. The record contains no reporter's transcript of the proceeding.

## D. Analysis

The aforementioned minute order is the foundation of defendant's argument that Judge Blanchard's denial of defendant's request that she recuse herself was an abuse of discretion as well as a denial of due process and a fair proceeding. As respondent notes, under Code of Civil Procedure section 170.3 a defendant's sole remedy is to challenge the denial by a writ of mandate.

Code of Civil Procedure section 170.3, subdivision (d) provides in pertinent part: "The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought only by the parties to the proceeding. The petition for the writ shall be filed and served within 10 days after service of written notice of entry of the court's order determining the question of disqualification." (See *People v. Lucas* (2014) 60 Cal.4th 153, 304; *People v. Williams* (1997) 16 Cal.4th 635, 652; *People v. Brown* (1993) 6 Cal.4th 322, 333, 334; *Roth v. Parker* (1997) 57 Cal.App.4th 542, 547-548.) "[A]s the Supreme Court observed, subdivision (d) 'has the dual purpose of promoting "judicial economy" and "fundamental fairness,"' both of which are fostered by the timely seeking of a writ of mandate. [Citation.]" (*People v. Barrera* (1999) 70 Cal.App.4th 541, 550.) The purpose behind subdivision (d) is to secure ""speedy review of a disqualification ruling, since permitting that ruling to be attacked later on appeal of the judgment could invalidate every ruling made by the trial court judge after the disqualification motion was denied."" (*Brown*, at p. 333, fn. 8.)

12

Accordingly, to the extent that the record shows that Judge Blanchard refused defendant's request to recuse herself, defendant's claim is not cognizable on appeal. (*People v. Lucas*, *supra*, 60 Cal.4th at p. 304.) Defendant forfeited the claim by failing to file a writ of mandate within the proper time period. Even if the request did not amount to a formal motion, the same procedure must be followed. (*People v. Barrera*, *supra*, 70 Cal.App.4th at p. 552.)

Respondent argues that defendant merely *assumes* her case was transferred to Department A16 as a result of a motion under Code of Civil Procedure section 170.6. Respondent asserts that on this record it is impossible to determine with certainty the reason for the transfer of defendant's case. Thus, respondent prefers to state that defendant has forfeited her claim for failure to provide an adequate record in the form of the transcript of the November 19, 2012 proceeding. Certainly, if the transfer were not the result of a section 170.6 motion, defendant's claim of prejudice (being denied the opportunity to file a section 170.6 motion against Judge Koppel) would be defeated. Not to mention that, if Judge Blanchard changed her mind and recused herself after all, the entire issue evaporates.

Prompted by respondent's brief, defendant acknowledges in her reply brief that she provided an incomplete record to this court and forgot to augment the record with the transcript in question. A few days before filing her reply brief, she submitted a motion to augment the record with the November 19, 2012 transcript and the trial court's disclosure form. Respondent filed an opposition to this motion, arguing there was no showing of good cause for the lengthy delay. We denied the augmentation motion as untimely on October 10, 2014.

We agree that defendant has clearly forfeited the statutory aspects of her claim, as well as her due process claim, by failing to provide an adequate record so that this court might determine not only the merits of her claims but also the procedural history. Moreover, even if defendant's forfeiture of the statutory claim were deemed solely a result of her failure to comply with Code of Civil Procedure section 170.3, we do not believe her due process claim survives. (See *Roth v. Parker*, *supra*, 57 Cal.App.4th at

13

pp. 547-549; cf. *People v. Brown*, *supra*, 6 Cal.4th at pp. 335-336.) With respect to such claims, the *Brown* court stated that "[i]n order to give maximum effect to the Legislature's clear intent that disqualification challenges be subject to prompt review by writ [citation], we conclude that a litigant may, and should, seek to resolve such issues by statutory means, and that his negligent failure to do so may constitute a forfeiture of his constitutional claim." (*Brown*, at p. 336.) The *Brown* court held that the defendant in that case was entitled to appeal on the basis of a constitutional due process claim that the judge who presided over his hearing was not impartial because (1) he sought writ relief as required by Code of Civil Procedure section 170.3, subdivision (d), and (2) because writ relief was summarily denied. (*Brown*, at p. 336.) In the instant case, defendant did not seek writ relief. Therefore, she has forfeited her due process claim as well. (See *People v. Lucas*, *supra*, 60 Cal.4th at p. 304.)

In any event, we believe any due process claim on the available facts is meritless. As stated in *Cowan*, "the due process clause operates more narrowly [than Code of Civil Procedure section 170.1, subdivision (a)(6)(A)(iii)]: '[W]hile a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient. Instead, based on an objective assessment of the circumstances in the particular case, there must exist "'the probability of actual bias on the part of the judge or decision maker [that] is too high to be constitutionally tolerable.'" [Citation.] Where only the appearance of bias is at issue, a litigant's recourse is to seek disqualification under state disqualification statutes: "Because the codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution." [Citation.] Finally, the court emphasized that only the most "extreme facts" would justify judicial disqualification based on the due process clause. [Citation.]' [Citation.]" (*Cowan*, *supra*, 50 Cal.4th at pp. 456-457, quoting *People v. Freeman*, *supra*, 47 Cal.4th 993, 996.)

The instant case does not contain such extreme facts so as to validate defendant's due process claim. At the outset, Judge Blanchard did not preside over defendant's trial.

14

And her refusal to recuse herself did not result in any prejudice by obliging defendant to file a motion under Code of Civil Procedure 170.6. Defendant's complaints about Judge Koppel relate solely to perceived errors in the conduct of the trial, and defendant does not and did not ever allege that Judge Koppel was biased against her or that she appeared to be biased. Furthermore, Judge Blanchard would not have been the trier of fact. As "[o]ne court has perceptively recognized . . . all other things being equal, the need for disqualification decreases by the extent to which the judge's rulings in the case are limited to purely legal matters. [Citation.] This is because a trial judge's factual findings are generally accorded considerable deference whereas legal rulings are subject to plenary appellate review. [Citations.] Equally significant, the circumstances giving rise to suspicions of partiality rarely involve the legal posture of the case." (*United Farm Workers of America v. Superior Court* (1985) 170 Cal.App.3d 97, 104-105.) The fact that Judge Blanchard was married to a sheriff's deputy who had no involvement in this case, and the endorsement of her candidacy by the county sheriffs in her election are simply "not so extreme or extraordinary that they would tempt '"the average . . . judge . . . not to hold the balance nice, clear and true between the State and the accused."'"[2] (*Cowan*, *supra*, 50 Cal.4th at p. 458, citing *Caperton v. A.T. Massey Coal Co., Inc.*, *supra*, 556 U.S. 868, 885.) Any accusation of actual bias on the part of Judge Blanchard is "remote and insubstantial." (*Cowan*, *supra*, 50 Cal.4th at p. 458.)

## II. Juror as Witness

### A. *Defendant's Argument*

Defendant contends she was denied her state and federal constitutional rights to due process, a fair trial, an impartial jury, and reliable verdicts when, over defense objection, former Juror No. 7 was permitted to testify for the prosecution. The evidence

---

[2] Although portions of the disqualification statute refer to the involvement of a judge's spouse, those references relate to spouses as parties, lawyers, or material witnesses in the proceeding, or to the financial interests of a spouse. (Code of Civ. Proc., § 170.1, subds. (a)(1)(B), (a)(3)(B)(ii), (a)(4), (5).)

15

was not relevant and, in addition, the court's ruling was an abuse of discretion under Evidence Code section 352.

### B. Proceedings Below

Voir dire began on February 26, 2013, and the jury was sworn on the afternoon of February 27, 2013. After opening statements on February 28, 2013, Juror No. 7 spoke with the judicial assistant. The juror was subsequently replaced with an alternate. It was learned that the juror recalled being at the scene of the incident at issue in the trial. After the morning session, defense counsel informed the court that both parties had interviewed Juror No. 7, J. S. Counsel told the court that if the prosecutor called J.S. as a witness, the defense would move for a mistrial because J.S. had been with the jurors for the last couple of days, and the jury would thus be dealing with a witness they knew. The court denied the motion without prejudice.

On the following day, defense counsel informed the court he was moving for a mistrial because the prosecutor had decided to call J.S. to the stand. Counsel complained that J.S. did not disclose during voir dire that he was a candidate for employment as a sheriff's deputy. Also, he had spent two days with the jury, and the fact that the jury members knew him added to his credibility.

J.S. was called before the trial judge and sworn in. In response to the prosecutor's questions, J.S. stated that he realized after hearing opening statements that he was at the scene of the incident. He had not discussed the incident with any of the jurors, since he did not know beforehand that the case was about that incident.

On cross-examination, J.S. acknowledged he was with the jurors in the jury room and in the hallway. He did not recall hearing during voir dire that the case involved a motorcycle, and he did not hear the location of the accident. With respect to his failure to mention his prospective employment during voir dire, J.S. recalled being asked if he knew any deputy sheriff related to the case, and he did not. Although one of the questions asked was whether a juror had any connections with law enforcement, J.S. thought the question was "more along the lines of relatives or anything I have direct contact with. I mean, the background investigator, I saw him once, and that was it. I

16

don't talk to him constantly or anything; so I can't say it's a relationship." Defense counsel had no further questions and the trial court told J.S. he would be sworn as a witness. The court denied the motion for mistrial. J.S. then briefly testified.

### C. Relevant Authority

Only relevant evidence is admissible. (Evid. Code, § 350.) All relevant evidence is admissible, except as otherwise provided by statute. (Evid. Code, § 351.) Relevant evidence is evidence, "including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" (*People v. Garceau* (1993) 6 Cal.4th 140, 177.)

Evidence Code section 352 provides an exception to the admission of relevant evidence, stating that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." A trial court's determination under Evidence Code section 352 will not be disturbed on appeal absent a clear showing of abuse of discretion. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)

The type of prejudice Evidence Code section 352 seeks to avoid is not the damage to a defense that naturally results from relevant and probative evidence, but rather the tendency to prejudge a person on the basis of extraneous factors. (*People v. Zapien* (1993) 4 Cal.4th 929, 958.) "The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Evidence is substantially more prejudicial than probative if it poses an unacceptable risk to the fairness of the proceedings or the reliability of the outcome. (*People v. Waidla* (2000) 22 Cal.4th 690, 724.)

17

### D. Analysis

As respondent notes, defendant did not object to J.S.'s testimony on the basis of relevance or on the ground that it was more prejudicial than probative. It is well established that failure to make a timely and specific objection constitutes waiver of an evidentiary objection and precludes raising that issue on appeal. (*People v. Valdez* (2012) 55 Cal.4th 82, 138-139.) The same holds true for defendant's constitutional complaints. (*People v. Clark* (2011) 52 Cal.4th 856, 955.)

In any event, we conclude the trial court did not abuse its discretion in allowing J.S. to testify. J.S.'s testimony was very brief, and he merely served to verify that the incident occurred and that there was no red car or any car stopped at the scene. This evidence was relevant in that it corroborated the testimony of Deputies Jackman and Matthews, and Bonilla.

We also conclude that admission of the evidence did not violate defendant's constitutional rights to a fair trial, an impartial jury, and reliable verdicts. In *People v. Sanders* (1988) 203 Cal.App.3d 1510 (*Sanders*), relied upon by defendant, the reviewing court reversed the judgment and held that the admission of the testimony of Anthony Melanche, a former juror in the case, impermissibly violated Sanders's constitutional right to trial by an impartial jury as guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution. (*Id*. at pp. 1511-1512.) Sanders was convicted of one count of possession of marijuana for sale. (*Id*. at p. 1511.) At voir dire, Melanche described his job as a security officer at a nightclub and observations of marijuana use. He spoke of being friendly with police officers and police involvement in arrests made at the nightclub. (*Id*. at p. 1515.) After the jury was sworn, Melanche told the court he knew Sanders as someone who had sold marijuana to his brother and his friends months after he allegedly committed the charged offense. (*Ibid*.) After he was excused from the jury, Melanche testified for the prosecution that Sanders sold marijuana subsequent to the time of the charged offense. (*Id*. at p. 1513.) The court found significant that Melanche spent two days with the jury panel during voir dire, and the other jurors heard his responses and gained further familiarity with him. (*Id*. at p.

18

1515.)  The court stated that, "[b]y virtue of the jury's familiarity and close association with Melanche, the jury may have attached greater credibility to his testimony," and there was a reasonable probability of prejudice.  (*Ibid*.)

In *Sanders*, unlike the instant case, the testimony of the former juror was extremely prejudicial and consisted of affirmative evidence indicating guilt.  The *Sanders* court clearly stated that "*[u]nder the facts of this case*," allowing Melanche to testify for the prosecution was prejudicial error.  (*Sanders*, *supra*, 203 Cal.App.3d at pp. 1515-1516.)  (Italics added.)  In the instant case, as noted, defendant eventually conceded she left the scene.  She based her defense on her claim that she did not drive while impaired and Deputy Matthews was negligent.  J.S.'s testimony had no bearing on this point, the essence of count 1, and likewise it did not affect the finding of great bodily injury.  Thus, unlike in *Sanders*, the jury's verdict in count 1 was based "solely on the evidence developed at trial" and there was no due process violation.  (*Id*. at p. 1515.)

*People v. Knox* (1979) 95 Cal.App.3d 420, cited by defendant, is not on point.  In that case, Knox alleged trial court error in refusing to allow a former juror to testify for him.  (*Id*. at p. 432.)  The court stated that Evidence Code section 704, which provides that a juror in the trial of an action may not testify as a witness, did not strictly apply to Knox's case, although it was a consideration.  The admissibility of the juror's testimony had to be considered independently of his former status as a juror.  (*Knox*, at p. 434.)  The court found, as in this case, that the former juror's testimony was admissible.  In *Knox*, however, the trial judge excluded the testimony under Evidence Code section 352, and the reviewing court found no abuse of discretion because the evidence was of slight probative value and would be unduly prejudicial.  (*Knox*, at p. 435.)  In the instant case, J.S.'s testimony was also admissible, and we conclude it is not more prejudicial than probative.

It is not reasonably probable that the jury would have reached a verdict more favorable to defendant had J.S.'s testimony not been heard.  (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)  It caused no undue prejudice, since it was not the sole evidence on this issue.  Ultimately, in closing argument, defense counsel conceded that

19

defendant fled the scene. The fact that the prosecutor mentioned J.S.'s testimony during closing argument was also not prejudicial. The reference was brief, and his referring to J.S. as a former juror does not reveal intent to prejudice, as defendant claims. It appears to have been simply a superfluous comment.

Defendant argues that the correct standard of review is the "harmless beyond a reasonable doubt" standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). The California Supreme Court has held that "the application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of *Watson*, *supra*, 46 Cal.2d at page 836." (*People v. Marks* (2003) 31 Cal.4th 197, 226-227.) As in *Marks*, we note that the result in this case would be the same under *Chapman*. (*Marks*, at p. 227.)

Defendant also complains that merely inquiring of J.S. if he had spoken with the jurors was not enough, since it was later revealed he was not "forthright" during voir dire, but we disagree. As discussed in the next portion of this opinion, J.S.'s reasons for not reporting his application for employment with the LASD were credible.

## III. Juror No. 7's Voir Dire Responses

### A. Defendant's Argument

Defendant claims she was denied due process, a fair trial, and reliable verdicts because J.S. was untruthful in his voir dire responses. According to defendant, J.S. was "devious and disingenuous" because he did not reveal he was seeking employment with LASD and a background check was being conducted on him. This constituted gross juror misconduct, since it is inconceivable that defense counsel would have accepted an "LASD wannabe" as a juror given the fact that every prosecution witness except Bonilla was either a deputy sheriff or otherwise employed by LASD.

### B. Relevant Authority

Voir dire is designed to assure a criminal defendant that he will not be deprived of his or her right to an impartial jury as guaranteed by the Sixth Amendment. (*In re Hitchings* (1993) 6 Cal.4th 97, 110 (*Hitchings*).) In addition, an inadequate voir dire

20

undermines the defendant's right to challenge a juror for cause or exercise peremptory challenges. (*Id.* at pp. 111-112; see also *Rosales-Lopez v. United States* (1981) 451 U.S. 182, 188.) Voir dire is only effective, however, if prospective jurors answer truthfully the questions posed to them, thereby exposing any possible biases on their part. (*Hitchings*, at p. 111.) A juror who conceals relevant facts or answers falsely impairs the jury selection process and commits misconduct. (*Ibid.*)

"'As a general rule, juror misconduct "raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted." [Citations.]' [Citation.] . . . . 'Whether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination. [Citations.]'" (*People v. Majors* (1998) 18 Cal.4th 385, 417; see also *In re Hamilton* (1999) 20 Cal.4th 273, 295.) Whether a verdict must be overturned for jury misconduct is resolved by employing the substantial likelihood test, which is an objective standard. (*In re Hamilton*, at p. 296.) "Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice . . . ." (*Ibid.*) "'Some of the factors to be considered when determining whether the presumption is rebutted are the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued.'" (*People v. Von Villas* (1992) 11 Cal.App.4th 175, 256.)

### C. Forfeiture

A defendant's failure to make a timely and specific objection on the ground asserted on appeal leads to forfeiture of the claim. Here, defendant sought a mistrial when J.S. was called to the stand, but she did not seek to reopen voir dire. (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 314.) Defendant made no claim below that her state and federal constitutional rights to due process, a fair trial, and reliable verdicts were violated. Therefore, she has forfeited these claims.

### D. Analysis

Defendant and respondent agree that J.S.'s juror identification number was 1002, and they quote at length from his voir dire responses. The pertinent responses—the ones defendant alleges are demonstrative of J.S.'s deviousness—would be those relating to law enforcement. The record contains no copy of the standard juror questionnaire the court used. From the answers given by all of the jurors, it appears that question No. 5 asked the jurors if they had any relatives in law enforcement. Indeed, on cross-examination, defense counsel asked J.S., "Do you recall reading in the general questions that you were asked are you or have you ever been a member of any law enforcement agency? Do you have contact with law enforcement in your employment? And law enforcement agencies including the sheriff's office? Do you remember reading that?" J.S. said that he did. Counsel then asked, "Do you remember reading No. 5, do you have any relatives or close friends who are or ever been members of any law enforcement agency?" J.S. replied, "Yes, I do." Counsel asked, "And you were asked if you had any 'yes' answers to those questions, and you didn't indicate that you did; is that correct?" J.S. acknowledged that it was. Counsel asked, "Isn't it true that you've been considered for hire with the L.A. County Sheriff's Department and a background check has been done on you now for that position?" J.S. replied, "Yes."

On redirect, the prosecutor asked J.S. if he had lied about any questions, and J.S. replied, "No, I did not. As the question stated, it says if I have any relatives or friends. I do not associate with anyone that I have ever had contact with; so it didn't seem like it was affecting it in any way." Further questions elicited that he had met with an investigator one time for 15 minutes and that was the sum total of all of his contacts with the deputies. Defense counsel did not re-cross-examine J.S.

We do not believe the record establishes that J.S. was deceitful or even disingenuous on voir dire. Certainly, the moment he realized he was present at the scene of the incident—something only he would have known—he reported it to the judicial assistant.

22

In *Hitchings*, after defendant was convicted, a juror was reported to have made up her mind about the case before being chosen, to have prior knowledge about the case, and to have discussed the case at her workplace while a juror. (*Hitchings*, *supra*, 6 Cal.4th at pp. 103, 110.) The defendant filed a writ of habeas corpus alleging juror misconduct, and the court agreed. (*Id*. at pp. 103, 116, 118.) The court stated that juror misconduct involving the concealment of material information of voir dire raises a presumption of prejudice. (*Id*. at p. 119.) The court found that the juror intentionally concealed her knowledge of the case and spoke to a friend about the case while a sitting juror. The People had failed to rebut the presumption of prejudice that arose from these conditions. (*Id*. a p. 122.)

*Hitchings* is readily distinguishable from defendant's case in that J.S. never served as a juror on defendant's case. And by allowing J.S. to testify, the court impliedly found he did not lie or conceal facts on voir dire and thus committed no misconduct. As we have noted *ante*, substantial evidence supports this ruling.

Even if J.S. committed misconduct, any presumption of prejudice is rebutted. The presumption of prejudice ""may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party [resulting from the misconduct]. . . .'" [Citations]." (*Hitchings*, *supra*, 6 Cal.4th at p. 119.) Here, any presumption is rebutted at the outset by the fact that J.S. did not serve on the jury. We find speculative defendant's assertion that defense counsel would likely have exercised a peremptory challenge to J.S. had he known about J.S.'s application to become a sheriff. Defense counsel did not question J.S. even after J.S. answered as follows when the prosecutor asked if injury to an officer on duty was just part of their duty: "The way I see it is the cop is doing his job. They might take advantage of it. They might not. And then us the public, we see they are there to not hurt us, and they are here to help. We take advantage of it. If we hurt them, we should pay for it. It's wrong." Defense counsel accepted J.S. as a juror even though, as defendant asserts, "the most critical element in jury selection in this particular case involved the fact that a deputy was

23

injured." And defendant does not complain that her jury was biased in any way. (See *People v. Black* (2014) 58 Cal.4th 912, 914 [defendant who was denied challenges for cause and forced to use all peremptory challenges due to trial court error not entitled to reversal of judgment "[b]ecause no incompetent juror who should have been dismissed for cause sat on [defendant's] case].")

We conclude beyond a reasonable doubt that J.S.'s failure to mention his application with the LASD did not result in a denial of due process, a fair trial, and reliable verdicts.

## IV. Admission of Videos

### A. Defendant's Argument

Defendant contends that his objections to admission of videos showing examples of a 40-mile-per-hour deceleration test and a field sobriety test should have been sustained under Evidence Code section 352 as more prejudicial than probative. Moreover, both videos constituted inadmissible hearsay, were irrelevant under Evidence Code sections 210 and 350, and were not timely presented to the defense. Defendant asserts that admission of the videos also violated her statutory and state and federal constitutional rights to confrontation and cross-examination, thus resulting in a denial of due process, a fair trial, and reliable verdicts.

### B. Proceedings Below

Prior to trial, but after the jury was sworn, defense counsel told the court that the People had just provided him with the videos of the deceleration and field sobriety tests. He objected to the prosecution offering them. The prosecutor explained he had learned the previous evening that deputies are tested once a quarter on their ability to "ride a motorcycle from zero to 40," and he had obtained the video from the Internet. The video showed an officer performing the test. Defense counsel argued that it was hearsay, and he should have been advised of it earlier in order to offer an expert or a defense against it. With respect to the video of the field sobriety test, counsel argued that the officer who tested defendant could demonstrate the test for the jury. The court told the prosecutor to show defense counsel the videos during the next recess.

24

After opening statements, Deputy Jackman testified. Deputy Jackman described the events leading up to Deputy Matthews's fall and estimated that Deputy Matthews was traveling at approximately five to 10 miles per hour when he hit the car. Deputy Jackman described the training a motorcycle deputy must undergo. He then described the "40 decel" test. After reaching the speed of 40 miles per hour, the deputy must hit the brakes at a designated point and stop within a certain distance. He explained that meeting the standard is a learned skill that takes practice. In the test, the deputies must perform it successfully three times in a row to pass. The deputies take the test four times a year.

The prosecutor subsequently introduced People's exhibit 7 over a defense objection. Deputy Jackman testified he had viewed the video and stated it was from a different agency, but it was "pretty much identical" to the LASD test. Deputy Jackman confirmed that the video mirrored his experience with the test.

Deputy Steven Van Ornum interviewed defendant when she was detained and testified that her demeanor prompted him to conduct a DUI investigation. He described each field sobriety test he performed. Over the defense objection, the prosecutor played a video (People's exhibit 13) that showed examples of how certain sobriety tests are conducted.

### C. Relevant Authority

We will disturb a trial court's exercise of discretion in admitting evidence only when the trial court's decision exceeds the bounds of reason. (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1519.) Similarly, the trial court's determination that the probative value of evidence outweighs its prejudicial effect under Evidence Code section 352 is a discretionary power that "must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Jordan* (1986) 42 Cal.3d 308, 316.)

### D. Analysis

Once again, we note that defendant did not object based on relevance or prejudicial effect. Therefore she has forfeited any arguments on these grounds. (*People v. Kipp*, *supra*, 26 Cal.4th at p. 1124; Evid. Code, § 353, subd. (a).)

With respect to the hearsay claim made below, "'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) The hearsay rule states that, "[e]xcept as provided by law, hearsay evidence is inadmissible." (*Id.*, subds. (b), (c).)

Evidence Code section 225 provides that a "'[s]tatement'" means (a) oral or written verbal expression or (b) nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression." The videos presented below were not verbal expression. In addition, a statement must be made by a person, and Evidence Code section 175 provides that "person" includes "a natural person, firm, association, organization, partnership, business trust, corporation, limited liability company, or public entity." The videos in this case do not fit in any of those categories.

"'The essence of the hearsay rule is a requirement that testimonial assertions shall be subjected to the test of cross-examination. [Citation.] The basic theory is that the many possible deficiencies, suppressions, sources of error and untrustworthiness, which lie underneath the bare untested assertion of a witness, may be best brought to light and exposed by the test of cross-examination. [Citation.]' [Citations.]." (*People v. Nazary* (2010) 191 Cal.App.4th 727, 754-755.) As "demonstrative evidence," videos are not testimony subject to cross-examination and are not hearsay. (*People v. Cooper* (2007) 148 Cal.App.4th 731, 746.) Thus, the hearsay rule did not require their exclusion from evidence. Moreover, the witnesses who testified regarding these exhibits were subject to cross-examination.

With respect to relevance, "'except in rare cases of abuse, demonstrative evidence that tends to prove a material issue or clarify the circumstances of the crime is admissible despite its prejudicial tendency.'" (*People v. Cavanaugh* (1955) 44 Cal.2d 252, 267.)

The evidence of the videos in this case clarified the circumstances of Deputy Van Ornum's assessment of whether defendant was impaired, as well as the circumstances of Deputy Matthews's attempt to avoid a collision with defendant's vehicle.

We conclude the evidence was not more prejudicial than probative. The videos clarified and explained technical terms relevant to the issues at trial. At the same time, they had no emotional content at all and thus were unlikely to "'evoke an emotional bias against a party as an individual.'" (*People v. Scheid* (1997) 16 Cal.4th 1, 19.) It was clearly explained to the jury that the videos in no way depicted defendant's field sobriety test or the incident with Deputy Matthews. Therefore, there was no miscarriage of justice and the trial court did not abuse its discretion. Furthermore, any error in presenting the videos was harmless even if they were not timely shown to the defense. It is not reasonably probable the evidence affected the jury's verdicts. They were merely a visualization of the testimony offered by Deputy Jackman and Deputy Van Ornum. (See *People v. Rivera* (2011) 201 Cal.App.4th 353, 366.) As our Supreme Court has explained, a claim of prejudice "'is substantially undercut . . . by similar evidence in the record which is not challenged.'" (*People v. Blacksher* (2011) 52 Cal.4th 769, 829.)

## V. Alleged Prosecutorial Misconduct

### A. Defendant's Argument

Defendant contends the prosecutor engaged in egregious and reprehensible misconduct that resulted a fundamentally unfair trial. She alleges six instances of such misconduct.

### B. Relevant Authority

"The applicable federal and state standards regarding prosecutorial misconduct are well established. '"A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" [Citation.]

27

As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]  Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

The general rule requiring assignment of misconduct and a request for jury admonishment does not apply if a defendant's objection or request for admonition would have been futile or would not have cured the harm.  (*People v. McDermott* (2002) 28 Cal.4th 946, 1001.)  It also does not apply when the trial court promptly overrules an objection, resulting in the defendant having no opportunity to request an admonition. (*Ibid*.)

Even when prosecutorial misconduct occurs, reversal is not required unless the defendant can show he suffered prejudice.  (See *People v. Arias* (1996) 13 Cal.4th 92, 161.)  Defendant must show that it is reasonably probable he would have obtained a result more favorable in the absence of the misconduct.  (*Ibid*.)

### C.  Analysis

#### 1.  Urine Sample

The defense filed a motion to appoint an expert and moved to seal the request on December 6, 2012.  Judge Bernie C. LaForteza signed an order stating, inter alia, that the fact that an application had been made would be confidential, as would the contents of the application.  On the same day, an order was signed directing the LASD to make available to a representative of Forensic Toxicology Associates a portion of defendant's urine sample sufficient for chemical analysis, and another order appointing John J. Treuting as an expert witness for the defense.

At trial, Deputy Jeff Perkins identified a laboratory receipt in defendant's name (People's exhibit 11).  The receipt was associated with a container that normally contained urine, but the container was empty.  Defense counsel objected when the

28

prosecutor asked Perkins if the records indicated whether the defense "had done a split" and used urine for their own testing. Perkins said the records did not indicate whether or not this was done. The prosecutor asked Perkins if he had any knowledge of whether the urine had been used, and defense counsel objected. Perkins answered that he did not know.

The prosecutor subsequently called criminalist Steven Kline, who was responsible for the analysis of drugs of abuse in urine and blood samples. The prosecutor elicited that at the People's direction, Kline had attempted to do further testing of the defendant's urine sample, but he learned that the sample had been exhausted. Kline testified without objection that the defense had obtained a court order requesting that a portion of the sample "get split." The sheriff's laboratory generally gives the defense laboratory 10 milligrams of the sample. Because there were only 9.5 milligrams of the sample remaining in this case and no further testing had been requested at that time by the prosecution, the sheriff's laboratory gave all 9.5 milligrams to the defense. Thus, the sheriff's laboratory was unable to test for sleeping pills and narcotic analgesics, which were not part of the standard test. Defense counsel did not object to this testimony. After Kline's testimony, the People rested.

The People did not mention the exhaustion of the urine sample in their closing argument. In his closing argument, defense counsel complained that law enforcement did not ask the laboratory to retest for a specific narcotic analgesic until approximately a week before trial. He stated, "They got the test results back in October and it didn't say it was there. Why didn't they ask then? Why do they wait until a week ago? Because they don't have any proof. And then when he said, well, we are going to try to do it but we don't have any sample left, that is not proof. You call that proof beyond a reasonable doubt that she is under the influence of a narcotic analgesic because they say, well, we would have tried to run a test if we had a sample, that's nonsense."

In rebuttal argument, the prosecutor stated, "Now the opiate class you heard from Mr. Kline, or Dr. Kline, that their opiate screen doesn't screen for every last opiate, which is why he wanted to do a rescreen, but, unfortunately, there was no sample left.

29

The testimony you heard is that the rest of the sample was for the defense. One of the great powers in rebuttal argument is our ability to point out the state of the evidence and the lack of calling a reasonable witness and the lack of putting in the logical piece of evidence. The defense never presented a urine test to you. They had half the sample. You have not heard it in this case at all. And you get to ask why. You get to consider that when you get into the jury room."

The prosecutor later stated, "I already pointed out the marijuana [] is confirmed in the lab results. So you can't really have it both ways. There is a reason why the opiate isn't in the lab result. Dr. Kline, or Mr. Kline, told you all about it. He wanted to rescreen but the defense has—the defense took and split the remainder of the urine. They were unable to retest it."

Finally, the prosecutor stated, "There is a whole heroin argument here as well. It came out pretty clearly that the opiate class is what a narcotic—part of the class of a narcotic analgesic, which is to say a pain reliever. You also heard even their expert say we don't test for everything. The tests cost money. Part of the budgetary procedures. They do a general screen and sometimes even their expert said in 10 to 15 percent of the cases he got out of San Diego they will go back and retest. It's standard reason to believe that there is no sample left. Would it be reasonable to you to share with the defense to give them an opportunity to test it as well?" At this point, defense counsel stated, "I will interpose an objection, your Honor. Can we approach?" The court stated, "Not at this time. But I will reserve ruling on the objection. At this time it's overruled, subject to rehearing."

Following closing arguments, defense counsel moved for a mistrial based on the court allowing the prosecutor over defense objection to mention that the defense had received part of the urine sample. Defense counsel stated that the defense motion requesting the urine sample was under seal, and the defense had not disclosed the fact that they had received part of the sample or the results of any testing. According to counsel, the prosecution's mention of it was a violation of attorney-client confidentiality. When asked to respond, the prosecutor stated that the fact of the split was in evidence in

30

the testimony of Kline. Since it was in evidence it was "available for argument" despite whatever order there may have been. Defense counsel replied that he had objected to the mention of a split before Kline testified, and therefore the defense did not waive any right to confidentiality. The court summarily denied the motion.

Defendant has clearly forfeited any issue of prosecutorial misconduct for failure to object on that basis below. In any event, her argument is meritless. """[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]""" (*People v. Ward* (2005) 36 Cal.4th 186, 215.) "[E]ven otherwise prejudicial prosecutorial argument[s], when made within proper limits in rebuttal to arguments of defense counsel, do not constitute misconduct." (*People v. McDaniel* (1976) 16 Cal.3d 156, 177.)

Here, the prosecutor's mention of the defense obtaining the remainder of the urine sample was a logical rebuttal to the defense argument. When Kline testified that all that was left of the sample was sent to the defense, there was no objection from defense counsel. Although counsel later stated at the time of moving for a mistrial that he had objected on this point before Kline's testimony, the only objection was to testimony by Deputy Perkins, who stated he did not know what happened to the rest of the sample. Moreover, with respect to defense counsel's assertion that the court had already ruled on the issue, we note that defendant acknowledges she could not locate in the record any prior ruling regarding the admissibility of evidence of the split. Therefore, the record does not support her claim. (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 549 [uncertainty in the record must be resolved against the defendant].) Furthermore, there is a difference between commenting on the defendant's failure to produce certain evidence and arguing that a defendant had a duty to produce that evidence. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340; see also *People v. Woods* (2006) 146 Cal.App.4th 106, 112.) The prosecutor's argument clearly did not assert the latter.

In any event, even if misconduct occurred in this regard, it was harmless under any standard. (*Chapman*, *supra*, 386 U.S. 18 [harmless beyond a reasonable doubt]; *Watson*,

31

*supra*, 46 Cal.2d 818 [reasonable probability the error did not affect the outcome].) There was strong evidence that defendant was driving while impaired through the testimony of Deputy Van Ornum and Kline. Defendant admitted having taken sleeping pills the night before. Toxicology tests revealed marijuana metabolite in her urine. Moreover, the jury was instructed that neither side is required to call all witnesses who might have information about the case or to produce all physical evidence that might be relevant. (CALCRIM No. 300.) It is presumed jurors understood and followed the instructions. (*People v. Chism* (2014) 58 Cal.4th 1266, 1299.)

<em>2. Prosecutor's Closing Argument</em>

<em>a. "Appealing to passions and prejudices" and "misstating the</em>

*law"*

Defendant contends that the third paragraph of the prosecutor's closing argument and his last statement during rebuttal argument sought to appeal to the jurors' passions and prejudices and generate sympathy for Deputy Matthews in addition to misstating the law. According to defendant, the prosecutor inappropriately focused on "justice for Deputy Matthews."

The disputed segments are as follows: "So let me just start out by telling you the God awful truth in all this. I have one terrific fear in this case. Really an overwhelming fear that you will get back in the jury room and someone will say, hey, why don't we just convict [defendant] of the hit and run and, you know, maybe the DUI isn't so clear. Let's just compromise. Let's just convict her of one of the two, which is totally against all the instructions we have."

A short time later, the prosecutor stated, "So just going back to what I said before, I just want to emphasize to you my great fear of a compromised verdict in this case. I just ask that you decide both counts. Don't let sympathy get the better of people. Please don't engage in negotiations back there. Please deliberate through both counts that we have, the DUI with injury and the fleeing from the scene of an injured party. Just to remind you of the oath that we talked about. I just want to remind you of one of the stories I told you in voir dire. The whole idea of would you convict somebody for

32

stealing a crate full of grapes?  Well, yeah, of course.  How about a bat [*sic*]?  Oh, yeah, sure.  How about one grape?  Well, this is why I tell the story.  Somebody in the back is going to try to get you to compromise.  It's good enough she's been convicted of one of the two.  Let it go.  I want you to remember the grape story and think about that story and think about Deputy Matthews when that occurs."

During rebuttal, the prosecutor argued, "I'm asking you to do your duty.  Follow the law, follow it all with a reasonable inference and all the circumstantial evidence in front of you and find her guilty for what she did to Deputy Matthews and to bring justice into this courtroom."

If an allegation of prosecutorial misconduct "'"focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." [Citation.]' [Citations.]" (*People v. Carter* (2005) 36 Cal.4th 1215, 1263.)  In deciding whether misconduct has occurred, we evaluate the prosecutor's comments "in the context of the argument as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) "'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 553-554.)

At the outset, the record shows that defendant did not object below on the grounds of prosecutorial misconduct and did not request an admonition to the jury.  Therefore, she has forfeited this issue on appeal.

Although "an appeal for sympathy for the victim is out of place during an objective determination of guilt," (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057, disapproved on another ground in *Stansbury v. California* (1994) 511 U.S. 318), here, the prosecutor's words were not reasonably likely to have been interpreted as such an appeal. The comments properly focused the jury on the evidence and the individual charges and urged it to reach a verdict on all the charges presented.  (See *People v. Wash* (1993) 6 Cal.4th 215, 261-262 [no misconduct when prosecutor urges jurors to do their duty].) Accordingly, there was no misconduct under either the state or federal Constitutions.

Finally, no harm could have resulted from the prosecutor's remarks. The jury was instructed with CALCRIM Nos. 101 and 200 that it must "not let bias, sympathy, prejudice, or public opinion influence [its] decision." We presume the jury followed these instructions, which were sufficient to dispel any prejudice created by the prosecutor's argument. (*People v. Chism*, *supra*, 58 Cal.4th at p. 1299.)

With respect to her second argument, defendant appears to contend that the prosecutor misstated the law when he told the jury that reaching a compromise would be totally against all of the jury instructions. Defendant asserts that the "law permits compromise verdicts," citing *People v. Carbajal* (2013) 56 Cal.4th 521, 533. It is true that jurors may acquit a defendant in an act of leniency or by reaching a compromise and that such verdicts are allowed to stand. (*People v. Palmer* (2001) 24 Cal.4th 856, 863; *People v. Lewis* (2001) 25 Cal.4th 610, 656; see also *U.S. v. Powell* (1984) 469 U.S. 57, 65.) This does not prevent the prosecutor from exhorting the jurors not to reach a compromise verdict based on sympathy for the defendant, a caution reiterated in the jury instructions. (CALCRIM Nos. 101, 200.) The prosecutor did not tell the jurors that a compromise verdict was illegal or invalid. Like the jury instructions, he urged them to reach a verdict on each count based on the facts and the law as given to them by the court.

### b. Alleged misstatement of facts

Defendant complains that the "prosecutor told the jury that two drugs were involved in this case, not just the marijuana" when making the following statement during argument: "The DRE program was started for this circumstance, where if one of the two drugs isn't confirmed by a urine analysis at the end, through no fault of anyone in this case, but his opinion was there is an analgesic involved." Defendant does not provide any argument on this point but merely states her complaint.

Once again, defendant failed to object below on the ground of prosecutorial misconduct and to request an admonition and has therefore forfeited this argument. (*People v. Brown*, *supra*, 31 Cal.4th 518, 553.) In any event, the record shows that the prosecutor elicited this very information from Deputy Cronin. Deputy Cronin testified he

34

had been certified in the DRE program and he explained the 12-step objective checklist used to evaluate drivers under the influence. He said there was a high correlation between the 12-step process used by DRE's and the results of toxicology testing. Deputy Cronin testified that his opinion as a DRE can still be used in a court of law even if all of the testing of a sample was not completed for whatever reason or if a sample is lost or destroyed. When the prosecutor asked, "In fact, is that part of the reason for LAPD developing the drug recognition testimony, to avoid the—where somebody has refused and coming into court?" Deputy Cronin stated that it was. Deputy Cronin stated that he rigorously followed the 12 steps. After his evaluation, he was of the opinion that defendant was under the influence of a narcotic analgesic and cannabis.

Thus, the record shows there was no misstatement of facts and no misconduct.

### c. *Prosecutor allegedly offered his own opinion*

Defendant complains that the prosecutor argued the following: "I think one of the most telling facts that I heard was even after she had been taken into custody at gunpoint, they measured her heart rate shortly thereafter, within 10, 15 minutes. It was 52 beats a minute. That's remarkable."

Once again, defendant did not object to this argument and requested no admonition. Therefore, this claim is forfeited.

"[A] prosecutor is free to give his [or her] opinion on the state of the evidence, and in arguing [the] case to the jury, has wide latitude to comment on both its quality and the credibility of witnesses. [Citations.]" (*People v. Padilla* (1995) 11 Cal.4th 891, 945-946, disapproved on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1; *People v. Mayfield* (1997) 14 Cal.4th 668, 782 ["[E]xpressions of belief in the defendant's guilt are not improper if the prosecutor makes clear that the belief is based on the evidence before the jury."].) It is not misconduct for a prosecutor to "ask the jury to believe the prosecution's version of events as drawn from the evidence." (*People v. Huggins* (2006) 38 Cal.4th 175, 207.)

The comments in question were neither deceptive nor reprehensible, nor did they infect the trial with unfairness. It is reasonable to believe that when the prosecutor used

the phrase "I think," the jurors were aware the prosecutor was referring to the evidence he cited. The phrase was the equivalent of saying, "the evidence shows," and there was no danger jurors would have been induced to abandon their own views of the evidence in favor of the prosecutor's assessment. (See generally *People v. Cummings* (1993) 4 Cal.4th 1233, 1303, fn. 48.) It was obvious the prosecutor was simply arguing an inference based on the evidence, not stating his personal belief resulting from experience or evidence outside the record.

### d. Alleged improper vouching

Defendant argues that the prosecutor improperly vouched for Bonilla, who was a critical witness for the prosecution, and who was contradicted by Deputy Matthews on whether defendant stopped at the stop sign. Defendant criticizes the following argument: "My view of her testimony, in 25 years, I'll bet she tells the same story because, you know what? In your life experience when you see somebody get hit by a car and knocked off of it, particularly a deputy on a motorcycle, you don't forget it. You are never going to forget it. She is not going to forget it in this case." Defendant made no objection below on the basis of vouching.

Improper vouching for the strength of the prosecution's case "''"involves an attempt to bolster a witness by reference to facts outside the record."' [Citation.] . . . [I]t is misconduct for prosecutors to vouch for the strength of their cases by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office . . . ." (*People v. Huggins*, *supra*, 38 Cal.4th at pp. 206-207.)

We do not believe the prosecutor even came close to vouching for Bonilla with this comment. A prosecutor's use of the first person, or phrases such as "I believe," or "I think" or even "we know," do not constitute improper vouching or opinion where the argument is directed to the state of the evidence and the inferences that may be drawn therefrom. (See *People v. Cummings*, *supra*, 4 Cal.4th 1233, 1303, fn. 48.) It has even been held that statements by prosecutors such as "'I think [the defendant] is guilty'" (*People v. Lopez*, *supra*, 42 Cal.4th at p. 971, italics omitted), or "'the only reason we brought [these charges], is because they're true'" (*People v. Stewart* (2004) 33 Cal.4th

425, 498), are not improper statements of personal belief when based on the evidence and when there was no implication that the prosecutor was relying on evidence not presented at trial. The prosecutor here did not imply that he had personal knowledge of Bonilla's truthfulness. He merely posited that a person in her position, having witnessed such an incident, would be unlikely to forget it. The jury was instructed that it alone was able to judge the credibility of witnesses, and the jury was given factors to consider in doing so. (CALCRIM No. 226.)

> e. *Argument regarding standard of proof; alleged denigration of defense counsel*

Defendant contends the prosecutor "improperly argued the definition of reasonable doubt and, in the process, denigrated defense counsel." The language defendant finds objectionable is as follows: "Here is two things they never tell you. Reasonable suspicion or probable cause, one of the lowest standards. You can be held in jail for 60 days with that standard. They can search your house with that standard. Another thing they never tell you, reasonable doubt is the same standard used for all traffic tickets. The notion that what can occur in life can drive your analysis of the standard of proof. I want you to keep those in mind when the argument is made to you." Defense counsel objected stating, "I want to object, your Honor. Reasonable suspicion is not proof beyond a reasonable doubt." The prosecutor responded, "I never said it was." The trial court stated, "Objection is noted and overruled. You may continue."

It is not clear from the prosecutor's words exactly what he was trying to explain when he referred to the notion that what can occur in life may drive one's analysis of the standard of proof. It is clear, however, that the prosecutor did not state that reasonable suspicion was proof beyond a reasonable doubt. If it was not clear from his argument, it was perfectly clear in his response to defense counsel. The prosecutor went on to remind the jury of one of the questions posed during voir dire, i.e., whether one can have some doubt at the end of a criminal case and still convict. The prosecutor stated, "Absolutely, you can. It's measured by reasonableness. Measured by reason and logic." We conclude

37

there was no misconduct, and we do not construe the prosecutor's remark to defense counsel as an attempt to denigrate counsel.

Defendant also views the following argument by the prosecutor as an attempt to disparage defense counsel: "I would ask you to focus on three things in this case because justice is always served when there is a focus on the crime, the crime and the crime. In this case, there are two individual counts. The defense often does not want to focus on the crime. They want to focus on material around the edges of the crime rather than the real guttural truth about Deputy Matthews being slammed into the concrete because Miss Buckner was so selfish that she drove impaired to a level that she broke somebody's bones and then didn't even bother to stay and leave her information."

"It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense" or to otherwise denigrate defense counsel. (*People v. Bemore* (2000) 22 Cal.4th 809, 846.) Nevertheless, an improper comment occurs only when there is "a personal attack" on defense counsel. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1166-1167.)

Defendant does not explain in what manner this argument might denigrate defense counsel, and it is not apparent to this court. The prosecutor did no more than tell the jurors not to be sidetracked by defense tactics, which has consistently been found to constitute appropriate argument. (See, e.g., *People v. Taylor*, *supra*, 26 Cal.4th at pp. 1166-1167 [it is not improper for a prosecutor to argue that defense counsel used "'tricks'" and "'moves'" to confuse a witness]; *People v. Medina* (1995) 11 Cal.4th 694, 759 [comments that experienced defense attorneys "'twist a little, poke a little, try to draw some speculation, try to get you to buy something'" not misconduct].) Likewise, in the instant case, there was no prosecutorial misconduct.[3]

---

[3]     Defendant also repeats in this category her argument that the prosecutor improperly told the jury that the instructions required it to reach verdicts in both counts. This is repetitive of her argument *ante*, and we addressed the issue sufficiently in that discussion.

38

### 3. *Conclusion*

Defendant contends the prosecutor engaged in cumulative prejudicial misconduct to the degree that reversal of the judgment is warranted. She argues that her constitutional rights to due process, a fundamentally fair trial, and reliable verdicts were violated. We have concluded there was no prejudicial misconduct, and defendant's arguments fail.

## VI. Sufficiency of the Evidence in Count 1

### A. *Defendant's Argument*

Defendant contends that two of the four elements of section 23153, subdivision (a) were not proved. According to defendant, the evidence showing she was under the influence of the active ingredient in marijuana (THC) or any other drug to the extent that it impaired her ability to drive was insufficient. In addition, the evidence was insufficient to prove that defendant committed an illegal act or neglected to perform a legal duty.

### B. *Relevant Authority*

"In reviewing a challenge of the sufficiency of the evidence, we apply the following standard of review: '[We] consider the evidence in a light most favorable to the judgment and presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment. The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt.' [Citations.] The United States Supreme Court has held: '[T]his inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] . . . The California Supreme Court has held, 'Reversal on this ground is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."' [Citations.]" (*People v. Gaut* (2002) 95 Cal.App.4th 1425, 1430.)

Given this court's limited role on appeal, defendant bears an enormous burden in arguing there was insufficient evidence to sustain the verdict. If the verdict is supported by substantial evidence, we are bound to give due deference to the trier of fact and not retry the case ourselves. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

Former section 23153, subdivision (a) provided: "It is unlawful for any person, while under the influence of any alcoholic beverage or drug, or under the combined influence of any alcoholic beverage and drug, to drive a vehicle and concurrently do any act forbidden by law, or neglect any duty imposed by law in driving the vehicle, which act or neglect proximately causes bodily injury to any person other than the driver." (Stats. 1992, ch. 974, § 18.)

### C. Analysis

#### 1. *Driving under the influence element*

CALCRIM No. 2100 instructed the jury that, to prove defendant guilty of violating section 23153, subdivision (a), the People had to prove that: (1) the defendant drove a vehicle; (2) when she drove a vehicle, she was under the influence of a drug or drugs; (3) while driving a vehicle under the influence, the defendant also committed an illegal act or neglected to perform a legal duty; and (4) the defendant's illegal act or failure to perform a legal duty caused bodily injury to another person. The jury was told that, "a person is under the influence if, as a result of taking a drug or drugs, his or her mental or physical abilities are so impaired that he or she is no longer able to drive a vehicle with the caution of a sober person, using ordinary care, under similar circumstances."

Defendant argues that there was no evidence presented that she was under the influence of THC, the active psychoactive ingredient in marijuana. In addition, no evidence was presented to indicate that the nanograms of inactive marijuana metabolite present in defendant's urine were responsible for the contradictory field sobriety test results or the incident. Dr. Treuting testified that the level of inactive metabolite in the urine has no correlation to the level circulating in the blood at any particular time. The lab results were negative as to any other drug or compound, and there was no physical

40

evidence indicative of recent marijuana use by defendant. Finally, she argues the findings by Deputies Van Ornum and Cronin upon examining defendant were inconsistent at best.

Kline testified that defendant's urine contained 1,280 nanograms per milliliter of marijuana metabolite. Kline stated that he synthesized all of the information in the police report with his training on the effect marijuana has on the body and his knowledge of whether particular physiological and behavioral signs are consistent or inconsistent with someone who may have smoked recently and therefore been under the influence. He testified that after looking at all of the information he had, he was of the opinion that defendant was impaired. He pointed to the signs of balance and coordination problems in the various tests, the signs of divided-attention test failures, both of which are skills necessary for safe driving. The collision itself was a factor in his opinion. Kline wanted to check the sample for depressants—specifically sleeping pills and narcotic analgesics, which would not have been detected in the initial screening, but he was unable to do so. Defendant admitted taking a sleeping aid the night before the incident. Deputy Cronin, a DRE, was of the opinion that defendant was under the influence of a narcotic analgesic and cannabis. After defendant's performance of the field sobriety tests, Deputy Van Ornum determined that she was under the influence of a controlled substance.

In addition, according to Bonilla, defendant failed to properly stop at the stop sign. She then made a turn in front of oncoming traffic. Finally, defendant did not stop after Deputy Matthews crashed, but fled the scene. She was later seen driving at 65 to 75 miles per hour on a residential street.

The totality of this evidence was sufficient to justify a reasonable inference that defendant was under the influence of a drug or drugs at the time of the incident.

### 2. *Illegal act / Failure to perform legal duty element*

CALCRIM No. 2100 also instructed the jury that the People alleged the defendant committed the illegal act of failing to stop and wait until it was reasonably safe to enter the intersection in violation of sections 21802 and 22450. The jury was instructed that defendant failed to perform the legal duty to exercise ordinary care at all times and to

41

maintain proper control of the vehicle, and she failed to perform the legal duty to obey the stop sign laws of sections 21802 and 22450. With special jury instruction No. 2100.1, the jury was told that "[a] driver violates VC § 21802 when a driver fails to yield the right-of-way to any vehicles which have approached from another road or highway. The driver must wait until he or she can proceed into the intersection with reasonable safety." The instruction also told the jury that "[a] driver violates VC § 22450 when a driver approaches a stop sign and fails to stop at the limit line."

The evidence showed that defendant failed to properly stop at the stop sign, which was an illegal act.[4] Defendant was shown to have unsafely entered the intersection when the two deputies had the right of way. Deputy Cronin's examination also revealed that defendant wore corrective lenses but she was not wearing them on the day of the incident. We conclude that sufficient evidence established this element of count 1.

## VII. Lack of Instruction of Lesser Included Offense

### A. Defendant's Argument

Defendant contends that under *People v. Capetillo* (1990) 220 Cal.App.3d 211 (*Capetillo*), she was entitled to a lesser included offense instruction on the misdemeanor offense of driving under the influence, without injury, under section 23152. She adds that the trial court used the wrong standard in denying her request for the instruction. According to defendant, defense counsel properly requested the lesser included instruction on the basis of his argument that defendant did not cause the injury, and there was substantial evidence in support of the defense theory.

### B. Relevant Authority

It is well-established that a trial court must instruct the jury not only on the crime charged but also on lesser offenses that are both included within the crime charged and supported by the evidence. (*People v. Barton* (1995) 12 Cal.4th 186, 190, 194-195.)

---

**4** The record shows that the jury was given no verdict form for count 3, in which defendant was charged with violating section 21802, which explains the lack of a conviction in count 3.

"[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) If the trial court fails in its duty to instruct on a lesser included offense supported by the evidence, the error is one of state law alone. (*Id.* at p. 165.) It does not require reversal unless "an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*Ibid.*; *Watson*, *supra*, 46 Cal.2d at p. 836.)

In deciding whether there is substantial evidence of a lesser included offense, we do not evaluate the credibility of the witnesses, which is a task for the jury. (*People v. Manriquez* (2005) 37 Cal.4th 547, 585.) "On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense." (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

### *C. Proceedings Below*

After the court received the People's jury instructions, it noted that the defense had asked for "lessers" and stated that the court was inclined to give instructions on the lesser included offenses, but neither party had submitted any such instructions. The prosecutor argued that, under *People v. Cole*, *supra*, 33 Cal.4th 1158, defendant was not entitled to an instruction on a lesser offense because "the lesser offenses would mean that there is no substantial evidence that there was an injury in this case," and "[t]here is no controversy . . . that Deputy Matthews is not just injured but injured severely." The court replied, "That is true." Defense counsel referred the court to *Capetillo*, *supra*, 220 Cal.App.3d 211. Counsel stated he planned to argue that defendant stopped, since Detective Matthews said she stopped, defendant told the officers she stopped, and the defense expert stated that scientific evidence indicated she stopped. He would argue that defendant then proceeded safely into the intersection because the deputy said she was

inching out into the intersection.  The defense position was that defendant did not cause the injury, but rather the deputy did because he ran into defendant.  The prosecutor argued that this was not evidence deserving consideration by the jury or that a reasonable jury could find persuasive.

Defense counsel reiterated there was evidence from Deputies Jackman and Matthews that Deputy Matthews ran into defendant and, since that was the state of the evidence, *Capetillo*, *supra*, 220 Cal.App.3d 211, applied.  The court stated, "You know, I think I was going to say to you I have never commented on evidence yet.  This was the first case that I considered doing it but I'm not going to do it.  But I'm also not going to give you that benefit of the doubt."  Defense counsel submitted on count 1 and noted it had requested another lesser included misdemeanor instruction for count 2.  The trial court stated, "The matter being submitted, the motion to include those as lessers is denied."

### D.  Analysis

Initially, we note that the trial court did not use a "benefit of the doubt" standard as defendant alleges.  The trial court's remark does not appear to be related to the standard it was employing when deciding whether or not to give the lesser instruction.  Absent evidence to the contrary, the trial court is presumed to be aware of and follow established law.  (*Ross v. Superior Court* (1977) 19 Cal.3d 899, 913.)

As noted in the prior section of this opinion, CALCRIM No. 2100 instructed the jury that, to prove defendant guilty of violating section 23153, subdivision (a), the People had to prove that:  (1) the defendant drove a vehicle; (2) when she drove a vehicle, she was under the influence of a drug or drugs; (3) while driving a vehicle under the influence, the defendant also committed an illegal act or neglected to perform a legal duty; and (4) the defendant's illegal act or failure to perform a legal duty caused bodily injury to another person.

Defendant argues that substantial evidence supports her theory that she was not the proximate cause of the injuries to Deputy Matthews.  First, Matthews's own testimony showed that defendant complied with the stop sign before she inched her way into the

44

intersection. Also, Matthews told the hospital that he ran into defendant, and Deputy Jackman said that Deputy Matthews grazed defendant's car. Defendant asserts that, "it was arguable that Matthews ran into [defendant]," and, therefore, defendant did not cause the injury.

As at trial, defendant relies on *Capetillo* in support of her argument. *Capetillo* is not on point. In that case, the court had difficulty defining the illegal act that the defendant committed. Capetillo was driving a stolen car and was involved in an accident in which the other driver was injured. Capetillo fled the scene. (*Capetillo*, *supra*, 220 Cal.App.3d at p. 215.) The reviewing court held that joyriding was not an illegal act committed *when* driving within the meaning of the statute, and therefore the evidence lacked substantial support showing the joyriding was the proximate cause of the accident and resulting injuries. (*Id*. at pp. 217, 220.) As for the hit and run, even assuming this was the illegal act committed when driving, there was no evidence that suggested the victim's injures were aggravated by Capetillo's fleeing the scene. (*Id*. at p. 220.) Thus, the prosecution failed to prove any injuries or aggravation to existing injures were proximately caused by Capetillo's failure to identify himself and render aid, and there was no support for a conviction of felony drunk driving. (*Ibid*.) The court modified the judgment and reduced the felony drunk driving conviction to the necessarily included crime of driving under the influence in violation of section 23152. (*Capetillo*, at p. 221)

*Capetillo* supports the judgment below. *Capetillo* states that the evidence must establish an unlawful act or omission in addition to driving under the influence. (*Capetillo*, *supra*, 220 Cal.App.3d at p. 216.) The violation of law must occur *when* the accused was driving the vehicle. (*Id*. at p. 217.) "The proper question is whether there was an unbroken connection between the wrongful act and the injury." (*Id*. at p. 220.) In the instant case, there was such a connection. Defendant, under the influence, performed an illegal act by leaving the location of the stop sign and proceeding into the intersection before it was safe. As a result, the collision occurred between her vehicle and the motorcycle. It does not matter if her illegal act resulted in Deputy Matthews hitting her vehicle because it could not be avoided, or if it resulted in her hitting Deputy Matthews's

45

motorcycle. As a consequence of that collision, Deputy Matthews was injured. Defendant was not entitled to a lesser included instruction.

## VIII. Alleged Violation of Penal Code Section 654

### A. Defendant's Argument

Defendant contends that the sentence in count 2 should have been stayed under Penal Code section 654 because her actions with regard to the commission of both section 21253 and section 20001 constituted an indivisible transaction with a single criminal objective.

### B. Relevant Authority

Penal Code section 654, subdivision (a) provides, in pertinent part, that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." When Penal Code section 654 applies, the proper procedure is to stay imposition of sentence on one of the crimes, with the stay to become permanent on completion of the term imposed on the other. (*People v. Pearson* (1986) 42 Cal.3d 351, 360

A defendant thus may not be punished for two separate crimes which arise either out of a single act or out of an indivisible transaction. The indivisibility or divisibility of criminal conduct depends upon whether the defendant has a single or separate criminal objectives. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.) If "[the defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.)

The determination of whether the facts reveal a single intent and objective is generally a factual matter, whereas the application of Penal Code section 654 to the facts is a question of law. (*People v. Perez* (1979) 23 Cal.3d 545, 552, fn. 5.)

*C. Analysis*

Defendant argues that her flight would not have occurred but for the "driving accident" and it was therefore one single, indivisible transaction. The flight was immediate, and her vehicle never stopped.

We disagree. In the instant case, there was clearly a divisible course of conduct based on two distinct intents and objectives. Driving under the influence in violation of section 23153 is a general intent crime. (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1312-1313.) Defendant's intent was therefore to do the act, which was to drive impaired. The collision with the motorcycle provides a clear dividing line. Indeed, it would be difficult to find a clearer line between acts in such close temporal proximity. After the collision with the motorcycle, defendant did not stop, identify herself, and perhaps render aid, but, rather, she deliberately fled the scene, thus demonstrating an intent to avoid criminal and/or civil liability for the collision.

Similar to defendant here, the defendant in *People v. Butler* (1986) 184 Cal.App.3d 469 argued that a person who causes a fatal accident while driving under the influence of alcohol and then flees the scene has engaged in an indivisible course of conduct and can be punished only once. (*Id.* at pp. 471-472.) The court held that in "the act of vehicular manslaughter defendant was acting with general intent; he negligently drove a motor vehicle while under the influence of alcohol and caused a fatal accident." (*Id.* at p. 474.) Butler then violated section 20001 by "intentionally leaving the scene of the accident instead of remaining and rendering aid as required by law. This was an independent and separate criminal act." The intent and objective of the latter offense was to flee in an attempt to hide his identity and state of intoxication. (*Butler*, at p. 474.)

Defendant employs an expansive interpretation of *People v. Calles* (2012) 209 Cal.App.4th 1200 in order to refute *Butler*. In *Calles*, the defendant, while high on nitrous oxide, ran his car into a group of pedestrians, killing two of them and severely injuring another. (*Calles*, at pp. 1205, 1207-1208.) He was convicted of, inter alia, three counts of leaving the scene of an accident, one for each victim. (*Id.* at p. 1204.) The *Calles* court held that the trial court incorrectly stayed execution of sentence on the three

47

counts of leaving the scene of an accident. The court stated there could be only one conviction for leaving the scene because there was only one act of leaving the scene. (*Id.* at p. 1217.) *Calles* does not stand for the broad proposition suggested by defendant, i.e., that the issue of whether leaving the scene carries a separate intent is to be decided on a case-by-case basis. Rather, *Calles* demonstrates only that in a case where there are multiple victims as a result of negligent driving by one perpetrator, there can be only one act of leaving the scene.

Defendant's argument is without merit.

## IX. Abuse of Discretion in Sentencing

### A. Defendant's Argument

Defendant contends "that the sentence constituted an abuse of discretion based on the fact that the victim was a deputy sheriff. Had it been a civilian, the sentence would have been less." She also claims a violation of her state and federal rights to equal protection and fair sentencing. She also contends the sentence was vindictive because a deputy sheriff was the victim, and judicial vindictiveness in sentencing violates due process.

Defendant points out that she had no recent criminal record and her prior cases were all misdemeanors. There was no evidence her past record involved intoxication or driving incidents. The probation report recommended a fine and three years of probation, and defendant had been working and taking classes while incarcerated during trial.

### B. Relevant Authority

A trial court is vested with wide discretion in sentencing. (*People v. Trausch* (1995) 36 Cal.App.4th 1239, 1247.) Judicial discretion "implies the absence of arbitrary determination, capricious disposition, or whimsical thinking. [] 'When the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion. An appellate tribunal is not authorized to substitute its judgment for that of the trial judge.'" (*People v. Henderson* (1986) 187 Cal.App.3d 1263, 1268.) Sentencing courts have wide discretion in weighing aggravating and mitigating factors, and a court need not state

48

its reasons for disregarding mitigating factors.  (*People v. Lamb* (1988) 206 Cal.App.3d 397, 401.)

"'The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. . . .  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'"  (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977-978.)

### C. Sentencing Proceedings

At the beginning of the sentencing hearing, Deputy Matthews gave a victim impact statement in which he explained how the collision "impacted [his] life considerably."  He suffered excruciating pain and had ongoing problems with his shoulder and probably would continue to have these problems for the rest of his life.  Not only did defendant leave the scene, she demonstrated no remorse.  He believed that defendant should get the maximum sentence.

Defense counsel argued that defendant had expressed remorse, which he had passed on to Deputy Matthews.  He informed the court of defendant's good conduct while incarcerated.  He also argued that defendant had been ready to plead guilty, but the prosecution reneged on its offer and changed it to five years, forcing them into trial.  Counsel requested the court to grant probation, or, in the alternative, impose the low term.

The prosecutor argued that defendant was ineligible for probation unless there was an unusual circumstance and noted that the court had already stated it was not a probation matter.  Defendant had four prior convictions as an adult.  The most recent was in 2007 for cruelty to a child.  She did not complete probation successfully, and she possibly had a substance abuse issue.  He advocated for the seven-year maximum.

The court stated that it was selecting the midterm because defendant had not been to prison before.  If defendant had no criminal history, the court would have selected the low term.  The court imposed the midterm of two years on count 1 with three years for

the great bodily injury enhancement for a total of five years. The court imposed the midterm of two years in count 2 to run concurrently.

### D. Analysis

We conclude the trial court did not abuse its discretion. There is no evidence to support defendant's bald accusation that the victim's status as a deputy sheriff influenced the trial court's sentencing decision or that the court was vindictive. The trial court gave adequate reasons for its sentencing choices and imposed the midterm although the prosecution requested the high term.

## X. Cruel and/or Unusual Punishment

### A. Defendant's Argument

Defendant contends that, even if there was no abuse of discretion, the sentence is cruel and/or unusual and disproportionate under both the federal and state Constitutions.

### B. Relevant Authority

A sentence violates the state constitutional ban on cruel or unusual punishment when it is so disproportionate that it "shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted (*Lynch*).) According to *Lynch*, the court (1) considers the nature of the offense and the offender; (2) compares the punishment to other punishments imposed in California for more serious offenses; and (3) compares the punishment to punishments imposed by the other jurisdictions for the same offense. (*Id.* at pp. 425-427.)

The usefulness of *Lynch*'s second and third techniques is questionable. The California Supreme Court has held in death penalty decisions subsequent to *Lynch* that "intercase" proportionality review is not required by the federal Constitution and "is not mandated under our state Constitution in order to ensure due process and equal protection, nor is it required in order to avoid the infliction of cruel or unusual punishment." (*People v. Crittenden* (1994) 9 Cal.4th 83, 156.) The court has indicated that all that is required is "intracase" review, i.e., an evaluation of whether the sentence is "grossly disproportionate" to the offense. (*People v. Bradford*, *supra*, 15 Cal.4th at p. 1384.)

In *Ewing v. California* (2003) 538 U.S. 11, in the lead opinion by Justice O'Connor, in which two justices joined her and two others concurred, the Court explained that the Eighth Amendment contains a "'"narrow proportionality principle"'" applicable to noncapital sentences. (*Ewing*, at p. 20.) It does not require strict proportionality between crime and sentence, but only forbids extreme sentences that are grossly disproportionate to the crime. (*Id*. at pp. 23-24.)

### C. Analysis

The determination of whether a particular sentence is grossly disproportionate to the crime requires an analysis of the offense and the offender—a fact-based inquiry that must be determined in the trial court. Therefore, defendant's failure to raise this point below constitutes a forfeiture of any right to pursue it on appeal. (*People v. Kelley* (1997) 52 Cal.App.4th 568, 583.) Although we reject defendant's contention on that basis alone, in any event, it has no merit.

The gross proportionality principle of the Eighth Amendment corresponds to the test used in analyzing whether a sentence is cruel or unusual under the California Constitution, as stated in *Lynch*, *supra*, 8 Cal.3d 410. The California Supreme Court has emphasized that the defendant must overcome a considerable burden in challenging a penalty as cruel or unusual. (*People v. Wingo* (1975) 14 Cal.3d 169, 174.) Likewise, the United States Supreme Court has stated that, "[t]he gross disproportionality principle reserves a constitutional violation for only the extraordinary case." (*Lockyer v. Andrade* (2003) 538 U.S. 63, 77; see also *Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 (conc. opn. of Kennedy, J.) [justices in the plurality who recognized a guarantee of proportionality review stressed that, "'"[o]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [are] exceedingly rare"'"].)

Defendant fails to overcome the burden of demonstrating that her sentence is cruel or unusual. Defendant received a midterm sentence with a great bodily injury enhancement. As the trial court noted, probation was out of the question, and defendant's record was not pristine. Hence, the low term was not warranted. The facts showed that

defendant drove while impaired and caused a collision that resulted in severe injuries to Deputy Matthews. Defendant's act of fleeing the scene revealed egregious indifference. Had she not left her license plate behind, defendant would have successfully evaded any responsibility, and it would appear this was her intention. A midterm sentence is neither cruel nor unusual under these circumstances, and the great bodily injury enhancement cannot be questioned.

Under the gross disproportionality principle that must guide our analysis of defendant's challenge, we conclude that her individual circumstances do not demonstrate that her punishment is cruel or unusual under the *Lynch* test, and it clearly fails under the federal test. Defendant's sentence does not "shock[] the conscience and offend[] fundamental notions of human dignity." (*Lynch*, *supra*, 8 Cal.3d at p. 424, fn. omitted.)

## XI. Cumulative Error

According to defendant, the case against her was not overwhelming, and the errors singly and/or cumulatively denied her due process. The result was a fundamentally unfair trial and unreliable verdicts.

In examining cumulative error, the critical question is "whether defendant received due process and a fair trial." (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349, overruled on another point in *People v. Whitmer* (2014) 59 Cal.4th 733, 742; accord, *People v. Cain* (1995) 10 Cal.4th 1, 82 [a defendant is entitled to a fair trial, not a perfect one].) A predicate to a claim of cumulative error is a finding of error. We have found no error. Therefore, there was no cumulative error requiring reversal. Our review of the record assures us that defendant received due process and a fair trial.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:

ASHMANN-GERST, J.          CHAVEZ, J.

52